**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 18-264 |
| | ) | Judge Nora Barry Fischer |
| TERRY ROBERTSON, | ) | |
| DARRYL FERGUSON, | ) | |
| JANICE MOORE, | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION**</u>

I.     INTRODUCTION

In this case, Defendants Terry Robertson, Darryl Ferguson and Janice Moore are charged in a multi-count indictment with several offenses arising from a traffic stop conducted by Pennsylvania State Trooper Dan Beatty on November 2, 2016, when he pulled over a rental vehicle operated by Robertson (with Moore and Ferguson as passengers) on the southbound Route 28 ramp to the Highland Park Bridge.   All of the Defendants are charged with one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 846, (Count One) and one count of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii), (Count Two). (Docket No. 3).   Ferguson and Moore are both charged with one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(A)(i) (Count Three).   (*Id.*).   Moore is also charged with one count of possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(D), (Count Four).   (*Id.*).

Presently before the Court are motions to suppress evidence on behalf of all of the

Defendants and the Government's opposition thereto.   (Docket Nos. 104; 110; 135).   The

Court held a suppression hearing on February 5, 2020, the official transcript of which was filed on

March 13, 2020.   (Docket Nos. 136; 138).   The Government, Robertson, Ferguson and Moore

each filed their proposed findings of fact and conclusions of law on different dates between March

25, 2020 and May 4, 2020, as the Court granted several extensions of time for Ferguson and Moore

to make their respective filings.   (Docket Nos. 139 (Government); 140 (Robertson); 145

(Ferguson); and 148 (Moore)).   The parties declined to submit any responses by the Court's

deadline of May 27, 2020, at which time the Court took the matter under advisement.   (Docket

No. 147).   After careful consideration of the parties' filings and the credible evidence of record,

and for the following reasons, Defendants' Motions to Suppress [104], [110] are denied.

II.    BACKGROUND

At the hearing, the Government presented the testimony of Trooper Beatty and introduced

three exhibits, including an Avis Rental Agreement; a Bench Warrant as to Robertson; and the

Dash Camera Video of the incident.   (Docket No. 136-1; Govt. Exs. 1-3).   The Defendants did

not call any witnesses but provided the Court with certain materials from the underlying state court

proceedings including a motion to suppress filed by Robertson and a transcript of a bench ruling by

the Hon. Anthony Mariani of the Court of Common Pleas of Allegheny County.   (*See* Docket No.

104 at attachments).   They also cross-examined Trooper Beatty.   (Docket No. 138 at 65-79, 90).

In this Court's opinion, Trooper Beatty offered credible testimony concerning the events in

question, despite efforts to impeach him.   *See United States v. Garcia,* 521 F. App'x 71, 73 (3d

Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings

are based on determinations regarding the credibility of witnesses ... for only the trial judge can be

aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").   He also presented as an experienced law enforcement officer.

In this regard, Trooper Beatty is a college graduate who earned bachelor's degrees in civil engineering and mathematics from the University of Pittsburgh at Johnstown and practiced civil engineering for approximately five (5) years prior to joining the Pennsylvania State Police Force in 2012.   (Docket No. 138 at 83-84).   At the time of the events in question, on November 2, 2016, Trooper Beatty was working highway patrol but as of the date of the February 5, 2020 hearing, he had moved on to an assignment with the Pennsylvania State Police, Bureau of Criminal Investigations, Southwest Strike Force Unit.   (*Id*. at 16-17).   Trooper Beatty explained to the Court his significant experience in conducting traffic stops and working drug cases as well as specific trainings he had attended concerning impaired drivers and identification of narcotics. (*Id*. at 17-19).   Most pertinent here, he detailed his extensive trainings for investigations of marijuana crimes focusing on the location and identification of the smell of both burnt and raw marijuana and advised that he had investigated approximately 150-200 cases involving marijuana prior to encountering the Defendants in this case.   (*Id*. at 19-20).   He also had conducted approximately 7,000 to 8,000 traffic stops and demonstrated a keen understanding of the Pennsylvania Motor Vehicle Code.   (*Id*. at 20).

Returning to the events of November 2, 2016, Trooper Beatty was conducting a routine traffic patrol of Route 28 in full uniform and a marked state police vehicle observing traffic heading southbound toward the City of Pittsburgh from the Harmar onramp.   (Docket No. 138 at 21).   He was well familiar with the area as he grew up near there and had worked that patrol in the

past.  (*Id*. at 20).   He explained that portion of Route 28 as "high-traffic"; "high-traffic violation"; and "high-traffic accident" due to the poor design of the highway system and the heavy traffic going into the City. (*Id*. 20-21).   From this position, Trooper Beatty observed a white Mazda drive past and abruptly apply its brakes, causing the nose of the car to dive to the ground when the car should have been accelerating to merge into traffic. (*Id*. at 21-22).   He also saw that the female passenger in the front seat looked directly at him, while the others in the car stared straight ahead.  (*Id*. at 22).   Trooper Beatty believed that the Mazda and its occupants acted in this manner because they were concerned by the presence of a police vehicle.  (*Id*. at 22-23).

Trooper Beatty recognized that it was a rental vehicle and had a Florida license plate. (Docket No. 138 at 23-24).   From his training and experience, Trooper Beatty knew that individuals engaged in criminal activity used rental vehicles and that Florida was a source state for narcotics.  (*Id*. at 24).   Trooper Beatty decided to enter the highway to further investigate the vehicle.  (*Id*.).   He did not activate his lights or sirens at this time but pulled out into traffic to pursue the Mazda from a distance.   As he approached the Mazda, which continued to drive south on Route 28, Trooper Beatty pulled up alongside the Mazda and observed that none of the occupants looked at him and it appeared than none of them were even talking to each other. (*Id*. at 25).

Trooper Beatty pulled off the highway to run the vehicle's registration but was unable to get the information at that time.  (Docket No. 138 at 26).   He then reentered the highway and activated his dash camera video, without turning on his lights or sirens.  (*Id*. at 26-27).   Trooper Beatty can also be heard narrating his observations on the microphone attached to his uniform. (Govt. Ex. 3). As he caught up to the Mazda, he observed that the vehicle was driving too closely

4

to the car it was following and also changed lanes while driving too closely, both of which are violations of the Pennsylvania Motor Vehicle Code.   (*Id*. at 28-32).   At the hearing, he explained that the vehicle should have been at least 5 car lengths apart under his training which involved computing 1 car length for each 10 miles per hour the cars were travelling which in this instance was approximately 53 miles per hour and at least 4 car lengths apart under PennDOT standards. (*Id*.).   He also commented that this activity took place at a dangerous point on southbound Route 28 as there is no median and the left lane becomes the exit ramp to the Highland Park Bridge causing cars accelerating in the left lane to have to change lanes abruptly in order to continue traveling toward the City.   (*Id*. at 30-31).   Having observed the Mazda violate the Pennsylvania Motor Vehicle Code, Trooper Beatty initiated a traffic stop of the vehicle by activating his overhead lights.   (*Id*. at 32).

The Mazda continued on the Highland Park Bridge ramp and pulled over after driving past a broken-down vehicle.   (Docket No. 138 at 32).   The dash camera video continued to roll as Trooper Beatty stopped and exited his police cruiser.   (Govt. Ex. 3).   He approached the passenger side of the vehicle.   (Docket No. 138 at 33-34).   He could see that the windows were rolled down and smell a freshly lit cigarillo.   (*Id*. at 34-35, 73-74). Trooper Beatty knew from his experience and training that individuals would often light a cigar or cigarette to mask other odors emanating from vehicles including narcotics.   (*Id*. at 35-36).   The female passenger complied and put out the cigarillo.   (*Id*. at 36).   Trooper Beatty introduced himself and had a conversation with the occupants about why he pulled them over and requested their licenses and the registration of the vehicle.   (*Id*.).   From his position near the passenger side window and now that the cigarillo was extinguished, Trooper Beatty explained that he smelled both burnt and raw marijuana

which he could identify from his training and experience. (*Id*. at 36-37, 42). In response to the Trooper's requests, the driver, Robertson, produced his driver's license and the rental agreement for the car, which showed that the agreement had expired on October 25, 2016 or more than a week prior to the stop and that the vehicle had been rented near the airport. (*Id*. at 37; Gov. Ex. 1). The female passenger, Moore, produced a Pennsylvania identification card rather than a driver's license and the backseat passenger, Ferguson, produced a Georgia driver's license after removing it from his sock. (*Id*. at 37-38). Trooper Beatty found this particular action suspicious because no one had ever taken off their shoe and sock and pulled a driver's license from their sock throughout his experience investigating thousands of traffic stops. (*Id*. at 38). The conversation continued and Robertson told Trooper Beatty that the rental car company had been calling him and requesting that he return the vehicle. (*Id*. at 39-40). Although Trooper Beatty did not presently believe that the car was stolen, he felt that it was an unauthorized use situation, which also violated a Pennsylvania statute and his investigation of a traffic stop had transitioned into an investigation of criminal offenses. (*Id*. at 40-41).

Instead of returning to his police vehicle to run NCIC checks of the occupants, Trooper Beatty removed Robertson to the rear of the vehicle to speak with him in an area in full view of the dash camera video. (Govt. Ex. 3; Docket No. 138 at 41-42). If he had done so, he would have learned that Robertson had an outstanding arrest warrant and taken him into custody. (Govt. Ex. 2; Docket No. 138 at 46). He also would have had the vehicle towed because the rental agreement had expired, neither Moore nor Ferguson were listed as authorized drivers, and Moore did not have a driver's license. (*Id*. at 40-41). In addition, an inventory search of the vehicle would have been conducted prior to the vehicle being towed and pursuant to Pennsylvania State Police policy, he

6

would have been required to search the trunk and any unlocked containers including bags.   (*Id.* at 58-60).

Returning to their discussion, Trooper Beatty told Robertson that he smelled marijuana and would be searching the vehicle and asked him some questions.   (Docket No. 138 at 42-44). Robertson explained that he was travelling form New Kensington to Wilkinsburg; that Moore was his wife of six years; and that he only knew the backseat passenger as "Guc."   (*Id.*).   He also informed Trooper Beatty that he had a prior record from 15 years ago which involved a stolen vehicle.   (*Id.*).   Trooper Beatty observed that Robertson looked overly anxious and nervous and could see that "his carotid artery was pumping in his neck"; at times he wouldn't make eye contact and was stretching throughout the conversation.   (*Id.* at 44-45).

Trooper Beatty next moved to the passenger side of the vehicle to speak with Moore. (Docket No. 138 at 48-49).   He asked her to step out of the vehicle and again smelled the odor of marijuana from inside the vehicle.   (*Id.* at 48).   He similarly questioned her about where they were driving and her explanation was inconsistent with what Robertson had told him.   (*Id.* at 49). He mentioned that he smelled marijuana and Moore admitted that she had a marijuana roach in her purse.   (*Id.* at 50).   Trooper Beatty told her that he would be searching the car and securing the marijuana roach to which Moore responded that she had a license to carry, which he believed meant that she had a gun.   (*Id.*).   As an experienced trooper, he understood that it was illegal for an individual to possess a firearm or carry permit while using marijuana.   (*Id.* at 51).   Moore provided consent for Trooper Beatty to search her purse and secure the weapon, so he retrieved the purse from the vehicle and placed it on the hood.   (*Id.*).   When he opened the purse, Trooper Beatty observed that the semi-automatic 9 millimeter firearm was in a dangerous position as it was

not secured and lacked a holster, protective sheath or trigger lock.   (*Id*. at 51-52).   He cleared the weapon and it was loaded with one round in the chamber.   (*Id*. at 52-53).   He was not able to find the marijuana roach in the purse and Moore assisted him in finding it.   (*Id*. at 53-54).   Trooper Beatty did not believe that the small marijuana roach was enough to produce the smell that he had observed at the beginning of the encounter.   (*Id*. at 54).   He secured the firearm and marijuana roach as evidence.   (*Id*.).   Trooper Beatty proceeded to speak to Ferguson.   (*Id*. at 55).   Ferguson stated that he did not know the other occupants and that he was trying to get back to Georgia, where he was from.   (*Id*.).

Trooper Beatty testified that after speaking with the occupants and based on all of the circumstances involved, he conducted a probable cause search of the vehicle to investigate for firearms and narcotics violations.   (Docket No. 138 at 56-57).   After searching the passenger compartments, he located a black bag in the trunk of the vehicle, which contained a large amount of narcotics, U.S. currency and another firearm.   (*Id*.).   All of the occupants were then placed under arrest and their cell phones were seized.   (*Id*. at 58).   The car was towed to a tow yard. (*Id*.).   Moore also agreed to an interview at the PSP barracks, at which time she admitted that she had marijuana on her person and handed Trooper Beatty a bag of raw marijuana she had been holding in her pants.   (*Id*. at 54).

The defendants were initially charged in state court with several offenses arising from the traffic stop.   *See Comm v. Robertson*, CC No. 2017-04931; *Comm v. Ferguson*, CC # 2017-04835; *Comm. v. Moore*, CC No. 2017-04834.   Litigation of the suppression motions ensued which resulted in a bench ruling by the Honorable Anthony Mariani in favor of the defendants suppressing the challenged evidence.   (*See* Docket No. 140 at ¶ 38; 145 at ¶ 15; 148 at

¶ 35).   However, the state case was nolle prossed and the federal charges described above were brought in this District.   (*Id.*).   The Court granted numerous extensions of time to file pretrial motions by the defendants until the pending motions were filed and/or joined by Robertson, Ferguson and Moore.   (*See* Docket Report at Crim. No. 18-264).

As noted, the Court accepted pre-hearing briefing on Defendants' motions; convened a motion hearing; secured the official transcript; received the parties' proposed findings of fact and conclusions of law; and the Government and the Defendants declined to file any responses by the deadline established by the Court.   (Docket Nos. 104; 110; 135; 139; 140; 145; 147; 148).   Since the motions are now fully briefed and argued, they are ripe for disposition.

III.    LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted). The trial judge is in the best position to observe the demeanor and tone of testifying witnesses and to evaluate credibility of their testimony.   *See Garcia,* 521 F. App'x at 73.

IV.    DISCUSSION

Defendants challenge the traffic stop as well as the search and seizure of evidence from the vehicle including marijuana, cocaine, U.S. currency, and firearms.   (Docket Nos. 104; 110; 140; 145; 148).   They also seek suppression of their cell phones and statements made by Moore as fruit of the poisonous tree arising from the allegedly unconstitutional law enforcement activities.   (*Id.*).  The Defendants advocate that the Court should adopt the ruling of Judge Mariani as well as his

findings suppressing evidence in state court and further maintain that this Court should hold that Trooper Beatty unlawfully extended the duration of the traffic stop for a minor motor vehicle violation to investigate other, unrelated criminal activity. (*Id.*). The Government counters that the vehicle was appropriately pulled over after Trooper Beatty observed motor vehicle code violations and alternatively argues that the Defendants lack standing to challenge the search of the vehicle and/or that the warrantless search of the vehicle was authorized under the automobile exception to the warrant requirement and/or would have been inevitably discovered. (Docket Nos. 134; 139). Having carefully considered the parties' positions in light of the evidence of record, the Court agrees with the Government that the instant suppression motions must be denied.

### A. Alleged Import of State Court Suppression Ruling

The Court initially turns to the Defendants' arguments seeking suppression of all evidence on the basis of the ruling by Judge Mariani in the Court of Common Pleas of Allegheny County. (Docket Nos. 104; 110; 140; 145; 148). The Government maintains that the evidence was lawfully seized in accordance with applicable federal precedent. (Docket Nos. 135; 139). In this Court's estimation, neither the state court's findings nor its ultimate ruling supports the requested relief because it is well established that a prior favorable suppression ruling in state court is not collateral estoppel in a subsequent federal prosecution and this Court must make an independent assessment of the evidence guided by federal precedent.

Initially, as the late Honorable Gary L. Lancaster noted in *Bonner v. United States*,

> [u]nder current precedent, neither double jeopardy nor collateral estoppel bar the instant prosecution [in federal court following a suppression ruling in state court]. *See United States v. Wilson*, 413 F.3d 382, 390 n. 10 (3d Cir. 2005) (prior rulings in a state court suppression hearing have no bearing on subsequent federal prosecution; finding that neither double jeopardy nor collateral

estoppel apply); *United States v. Pungitore*, 910 F.2d 1084, 1106 n. 18 (3d Cir.1990) (because the state and federal government are not the same parties, the court of appeals has interpreted the doctrine to mean that "collateral estoppel does not apply to successive prosecutions by different sovereigns."); *United States v. Grimes*, 641 F.2d 96, 103–04 (3d Cir.1981) (finding that successive state and federal prosecutions for same armed bank robbery did not violate the double jeopardy clause); *United States v. Agee*, 597 F.2d 350, 360 n. 34 (3d Cir.1979) ("[i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out.") (quoting *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)).

Although the court of appeals has expressed concern regarding the prosecution of the same individual in both the state and federal system for the same crime, it has specifically held that "we do not believe that we are the proper forum to overturn a legal directive from the Supreme Court." *Wilson*, 413 F.3d at 390 (citing *Grimes*, 641 F.2d at 104). Neither does this court. Thus, notwithstanding the policy issues raised by this case, we conclude that petitioner's prosecution in federal court was proper and that, for the reasons stated above, defense counsel was effective even though he did not file a motion to challenge subject matter jurisdiction. Accordingly, petitioner's motion to vacate on this ground will be denied with prejudice.

*Bonner v. United States*, Civ. A. No. 10-0354, 2010 WL 3419437, at *4–5 (W.D. Pa. Aug. 26, 2010).    Longstanding Third Circuit decisions further explain why the state court's findings are not binding, i.e.:

Agee contends that the district court erred when it refused his motion to suppress the heroin. He asserts that the doctrine of collateral estoppel barred the government from relitigating the ruling by the Philadelphia Court of Common Pleas. Agee's suggestion that *Ashe v. Swenson* precluded the district court from finding, as it did, that the police had probable cause to arrest Agee is without merit. The United States was not a party to the suppression hearing held in the state court nor were the actions of its officers under consideration in that forum. To hold that a state

11

court determination respecting the conduct of state officials is binding on the United States would extend the *Ashe* doctrine beyond its logical boundaries. *See United States v. Sifuentes*, 504 F.2d 845, 849 (4th Cir. 1974); *United States v. Smith*, 446 F.2d 200, 202 (4th Cir. 1971).

*United States v. Agee*, 597 F.2d 350, 360 (3d Cir. 1979). Rather, this Court must make an independent assessment of the search and seizure in relation to federal and not state law.   As the Supreme Court held long ago:

[i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

*Elkins v. United States*, 364 U.S. 206, 223–24, 80 S. Ct. 1437, 1447, 4 L. Ed. 2d 1669 (1960). Further, "'[i]t is a general rule that federal … courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law.'" *Wilson*, 413 F.3d at 387, n.5 (quoting *United States v. Rickus*, 737 F.2d 360, 363 (3d Cir. 1984)).

Accordingly, the Court must deny the suppression motions insofar as the Defendants advocate that this Court adopt Judge Mariani's findings and his decision suppressing evidence. To reiterate, Judge Mariani's findings are not binding and this Court must conduct an independent assessment of the evidence presented and evaluate same as it does at every suppression hearing.   *See Wilson*, 413 F.3d at 387, n.5.   That type of analysis follows.

   B.  *Terry Stop and Search of Vehicle*

All Defendants challenge the initial traffic stop and search of the vehicle.   (Docket Nos. 104; 110; 140; 145; 148).   They also maintain that the traffic stop was unreasonably lengthened

by Trooper Beatty and diverted to investigate other, unrelated crimes without reasonable suspicion to do so.   (*Id*.).   The Government posits that the initial traffic stop was supported by reasonable suspicion of a traffic violation and that the Defendants lack standing to challenge the search of the rental vehicle given the expired rental agreement.   (Docket Nos. 135; 139).   The Government continues that the searches were reasonable under the automobile exception as the totality of the circumstances provided probable cause to search the vehicle and that the evidence would have been inevitably discovered due to the combination of several factors including the expired rental agreement; an outstanding arrest warrant for the driver, Robertson; and, towing policies of the Pennsylvania State Police which would have required an inventory search of the vehicle.   (*Id*.).   It is this Court's opinion that even if Defendants demonstrated that they have a reasonable expectation of privacy in the rental vehicle, their suppression motions must be denied for the reasons articulated by the Government.

Helpfully, this Court has addressed many of these legal principles in recent decisions.

> The Fourth Amendment protects citizens against unreasonable searches and seizures.   U.S. Const. Amend. IV; *see also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches are per se unreasonable subject only to a few specifically established and well delineated exceptions.   *Horton v. California*, 496 U.S. 128, 133 (1990).   […] [T]he burden is on the Government to prove by a preponderance of the evidence that the searches fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992).   One exception to the warrant requirement is a *Terry* stop and frisk. Generally, *Terry v. Ohio*, 392 U.S. 1 (1968), permits a police officer to conduct "a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). A *Terry* patdown search is generally authorized after a lawful traffic stop if there is reasonable suspicion of criminal activity by the vehicle's occupants.   *See United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012).

*United States v. Stevenson*, Crim. No. 16-189, Docket No. 158 (W.D. Pa. Apr. 4, 2019).

> Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *Brown*, 448 F.3d at 247 (citation omitted). Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors. *Id.*

> In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); see also [*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)].

*United States v. Gardenhire*, Cr. No. 15-87, 2017 WL 1022578, at *4-5 (W.D. Pa. Mar. 16, 2017).

With respect to Defendants' position that the traffic stop was a pretext for investigating illegal activity, "the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006), *which cited Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).    The Court of Appeals has further explained that:

14

> an officer's Fourth Amendment burden of production is to (1)
> identify the ordinance or statute that he believed had been violated,
> and (2) provide specific, articulable facts that support an objective
> determination of whether any officer could have possessed
> reasonable suspicion of the alleged infraction. As long as both
> prongs are met, an officer's subjective understanding of the law at
> issue would not be relevant to the court's determination.

*United States v. Delfin-Colina*, 464 F.3d 392, 399-400 (3d Cir. 2006).  With that said, "a pretextual traffic stop requires the officer to have observed a traffic violation prior to initiating the traffic stop.  Otherwise, the officer's motivation for the stop could not be pretextual.  The corollary of this fundamental principle is that ex post facto justifications are impermissible." *Lewis*, 672 F.3d at 237.  Therefore, the record developed at the suppression hearing must be sufficient to demonstrate that the officer observed a traffic violation prior to initiating the traffic stop.  *Id.* at 880.

Here, this Court finds that the totality of the circumstances establish by a preponderance of the evidence that Trooper Beatty observed traffic violations prior to executing a traffic stop of the Mazda.  *See Lewis*, 672 F.3d at 237.  Trooper Beatty identified the violations committed by the driver as following too closely and changing lanes while following too closely in violation of the Pennsylvania Motor Vehicle Code.  (Docket No. 138 at 28-32).  Other courts have recognized that these types of violations observed by a law enforcement officer provide a reasonable basis to conduct a traffic stop.  *See e.g., United States v. Terry*, 2019 WL 2176330, at *11 (W.D. Pa. May 20, 2019) ("The Court finds that based on Trooper Marmol's experience and training on traffic stops and the Motor Vehicle Code, his testimony, and the MVR footage, he reasonably believed that the Ford Taurus was following too closely in violation of Section 3310(a).").  The Court holds that Trooper Beatty's testimony on these points was credible and

corroborated by the dash camera video presented at the hearing clearly showing the traffic violations committed by the driver of the Mazda, Robertson.   (Docket No. 138 at 28-32; Govt. Ex. 3).   Further, the fact that Trooper Beatty observed other suspicious activity by the occupants of the vehicle and desired to investigate same does not undermine the constitutionality of the traffic stop.  *See Lewis*, 672 F.3d at 237.

The Defendants next argue that the traffic stop was unreasonably lengthened beyond its stated purpose to investigate the minor traffic violation.   (Docket Nos. 104; 110; 140; 145; 148). The Government avers that the search was permissible under the automobile exception given that Trooper Beatty smelled marijuana and observed other suspicious behavior by the occupants. (Docket Nos. 135; 139).   As this Court has recounted previously, the law is well established that:

> [u]pon making a lawful traffic stop of a vehicle, police officers are granted the authority "to detain the automobile and its occupants pending an inquiry into a vehicular violation." [*Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)]. The officers then "may exercise reasonable superintendence over the car and its passengers," and have the discretion to either: (1) order the driver and passengers to get out of the vehicle; or (2) remain in the vehicle while the officers investigate the violation. [*United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004)] (citations omitted).
>
> *United States v. Edmonds*, Crim. No. 12-70, 2013 WL 6002234, at *8 (W.D. Pa. Nov. 12, 2013). "Once a valid traffic stop is initiated, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation," *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quotation and citation omitted), of "both 'past criminal activity' and 'imminent or ongoing criminal activity,' " *United States v. King*, 764 F. App'x 266, 268 (3d Cir. 2019) (quoting *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

16

However, the Fourth Amendment is violated "when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes.'" *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (quoting *Rodriguez v. United States*, —— U.S. ——, 135 S.Ct. 1609, 1615, 191 L.Ed.2d 492 (2015)). When considering this type of claim, the Court evaluates two factors: first, when the traffic stop was "measurably extended" to investigate non-traffic related crimes; and second, if the facts available to the officer were sufficient to establish reasonable suspicion at that moment. *See Green*, 897 F.3d at 179. "[A]bsent reasonable suspicion, any 'unrelated inquiries [that] measurably extend the duration of [a] stop are unlawful.'" *Green*, 897 F.3d at 179 (quoting *Rodriguez*, 135 S.Ct. at 1615). At the same time, "'ordinary inquiries incident to' a traffic stop [...] which serve the purpose of enforcing the traffic code" are permissible. *Id.* For example, "[a]ctions like 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance'" constitute ordinary inquiries incident to the traffic stop. *Id.* "Such inquiries are permissible because they serve the purpose of the traffic stop: ensuring roadway safety." *United States v. Terry*, No. 3:18-CR-24, 2019 WL 2176330, at *13 (W.D. Pa. May 20, 2019) (citing *Rodriguez*, 135 S.Ct. at 1615; *Clark*, 902 F.3d at 410). However, "measures aimed at detecting criminal activity more generally," may not measurably extend the duration of the traffic stop without reasonable suspicion. *Green*, 897 F.3d at 179-80 (citing *Rodriguez*, 135 S. Ct. at 1615).

*United States v. Burrus*, 402 F. Supp. 3d 116, 122–23 (W.D. Pa. 2019).   It is this Court's duty to determine the "*Rodriguez* moment," i.e., "when the tasks tied to the traffic stop are completed or reasonably should have been completed" and then evaluate whether the officer had reasonable suspicion to extend the traffic stop to investigate other matters.   *United States v. Garner*, 961 F.3d 264, 270 (3d Cir. May 29, 2020).   However, as the Court of Appeals recently held in *Garner*, which presented a strikingly similar factual scenario to the facts at issue here, if the investigating officer had reasonable suspicion prior to the *Rodriguez* moment, then there is no Fourth Amendment violation. *Id.* at 271-72.   In this regard, the Court of Appeals recited the following:

> [w]e hold Trooper Ramirez had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation. So no unlawful extension of the traffic stop ever occurred. When Ramirez first spotted the car, he noticed it had a New York license plate and appeared to be a rental car. After learning the vehicle belonged to Enterprise, he noticed it did not have the typical bar code stickers on the driver's window or the rear windshield. These observations aroused his suspicion because, in Ramirez's experience, rental vehicles usually had these stickers unless someone peeled them off in violation of a rental agreement.
>
> As Trooper Ramirez approached the vehicle, he smelled a strong odor of air freshener and saw air fresheners clipped on every vent, which was abnormal in his experience. Ramirez's questions related to the traffic stop revealed that Fruit was traveling along I-81 between New York City and Hagerstown, which Ramirez knew to be a drug trafficking corridor. Ramirez also saw that the rental agreement had expired two weeks earlier and Fruit seemed extremely nervous throughout the stop. In their totality, these factors are sufficient to show that Trooper Ramirez's suspicion of illegal activity was objectively reasonable. So he could extend the traffic stop and Fruit and Garner were not seized in violation of the Fourth Amendment.

*Garner*, 961 F.3d at 271-72.

Once again, the totality of the circumstances provided the experienced state trooper with reasonable suspicion of criminal activity prior to him removing Robertson from the vehicle and questioning him about his criminal history and other matters, which is the earliest point in time that the *Rodriguez* moment could have taken place.   *See Garner*, 961 F.3d at 271-72.   At this point in the encounter, Trooper Beatty had observed or was aware of the following suspicious activity:

- the Mazda abruptly applied its brakes after observing his marked police vehicle while traveling on an onramp to Route 28;

- the female passenger looked directly at him while the driver and passenger focused forward;

18

- the vehicle was a rental with a Florida license plate and Trooper Beatty knew that criminal actors used rental vehicles and that Florida was a source state for narcotics;

- as Trooper Beatty pulled alongside the Mazda, none of its occupants turned to look at him and did not appear to even be talking to each other, confirming his suspicion that they were concerned with the presence of a police vehicle;

- after Trooper Beatty departed the roadway, the Mazda continued and was observed driving too closely and changing lanes too closely to another vehicle, in violation of the Pennsylvania Motor Vehicle Code;

- when Trooper Beatty pulled the vehicle over, the female passenger, Moore, had recently lit a cigarillo, which he understood from training and experience was done by individuals to mask odors of narcotics;

- the rental agreement produced by Robertson had expired a week prior to the traffic stop;

- the rear passenger, Ferguson, pulled his Georgia driver's license from his sock and produced it to Trooper Beatty, something he had never seen after investigating thousands of traffic violations; and,

- Trooper Beatty smelled both burnt and raw marijuana after the smell from the cigarillo dissipated.

All told, such facts collectively provided Trooper Beatty with reasonable suspicion to investigate additional matters beyond the traffic violations including for violations of narcotics laws and potential unauthorized use of an automobile, as he testified.  *See Garner*, 961 F.3d at 271-72. Indeed, the Court of Appeals has held that "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (citing *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000)).

The Court also credits Trooper Beatty's explanation that the seemingly innocuous movements (and non-movements) by the occupants of the vehicle raised his suspicions that they were anxious by his presence.  *See Nelson*, 284 F.3d at 482.

The next issue for the Court's consideration is the constitutionality of the search of the vehicle.  Even assuming that the Defendants sufficiently established a reasonable expectation of privacy in the rental vehicle, the Court rejects their arguments that any Fourth Amendment violations occurred as the searches and seizures were clearly justified under the automobile exception to the warrant requirement.

> The United States Court of Appeals for the Third Circuit has recognized the "broad sweep of the automobile exception," pursuant to which a vehicle may be searched without a warrant upon a showing of probable cause that evidence of a crime may be located in the vehicle. [*United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014)]. As the Court of Appeals explains,

> the automobile exception includes two important elements specific to that exception: First, "[i]f probable cause justifies the search ..., it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." [*United States v. Ross*, 456 U.S. 798, 825 (1982)]. Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). As a result, the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982); *see also United States v. Johns*, 469 U.S. 478, 486–87 (1985) (extending the rule to closed packages seized from vehicles). *Donahue*, 764 F.3d 293, 300 (3d Cir. 2014). The probable cause inquiry "is entirely objective," *Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014), and is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983) (internal quotation marks and citations omitted). The Court evaluates "the events which occurred leading up to the ... search, and then ... [decides] whether these

20

historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). If there was a "fair probability that contraband or evidence of a crime" would have been found, there was probable cause for the search. *Gates*, 462 U.S. at 238.

*United States v. Somerville*, Crim. No. 17-222, 2019 WL 1316413, at *7–8 (W.D. Pa. Mar. 22, 2019), *reconsideration denied*, 2019 WL 4059028 (W.D. Pa. Aug. 27, 2019).   As noted above, "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (citing *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000)).   Similarly, "[t]he odor of marijuana in a car can be evidence of the most persuasive character" and generally satisfies probable cause to search the entirety of a vehicle under the automobile exception.   *Green*, 897 F.3d at 186.   Further, if a warrantless search is authorized under the automobile exception, law enforcement is justified in opening bags contained in the trunk.   *See Donahue*, 764 F.3d at 300.

Prior to searching the vehicle, Trooper Beatty was aware of all of the facts recounted above, including smelling both raw and burnt marijuana, but also developed additional facts supporting probable cause.   To that end,

- Robertson and Moore provided inconsistent statements concerning where they were going and what they had been doing;

- Moore admitted that she had a marijuana roach in her purse and also told him that she had a permit to carry, implying that she had a firearm; and,

- Moore provided Trooper Beatty with consent to obtain her purse from within the vehicle and secure the firearm for their safety.

21

In short, Trooper Beatty's credible testimony that he smelled burnt and raw marijuana in the vehicle and Moore's admissions that she had a marijuana roach in her purse and implied that she had a firearm provided probable cause to search the vehicle for evidence of illegal narcotics and firearms violations.   (Docket No. 138 at 57).   Trooper Beatty explained that it is illegal for an individual using marijuana to possess a firearm or a concealed carry permit, providing him with ample probable cause to conduct a search of the vehicle under the automobile exception.   (*Id*. at 51).   In addition, the fact that Trooper Beatty found a marijuana roach and a firearm within Moore's purse does not preclude his ability to search the entirety of the vehicle, particularly in light of his credible explanation that the small marijuana roach could not have produced the initial smell emanating from the vehicle.   *See Green,* 897 F.3d at 186.   Hence, he was justified in searching the remainder of the vehicle, including the unlocked bag in the trunk, for evidence of narcotics and firearms violations.   *See Donahue*, 764 F.3d at 300.

For all of these reasons, the Defendants' motions to suppress the evidence seized from the rental vehicle is denied.   The Court further holds that the motions to suppress evidence as fruit of the poisonous tree, including the Defendants' cell phones and evidence obtained from Moore at the PSP barracks, are likewise denied.   *See United States v. Miller*, 267 F. App'x 152, 154 (3d Cir. 2008) (quoting *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)) (further quotation omitted) ("[s]uppression of evidence as 'fruit of the poisonous tree' is only justified if 'the challenged evidence is in some sense the product of illegal governmental activity.'").

### C.  Inevitable Discovery

The Court alternatively holds that the Government has also demonstrated that the doctrine

of inevitable discovery would otherwise save the evidence from exclusion because "the police, following routine procedures, would have inevitably uncovered the evidence." *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)).

> An analysis of whether certain evidence would have been discovered in an inventory search, including whether an inventory search would have occurred at all, should be based "upon the historical facts capable of ready verification, and not speculation." *Id.*; *see also Nix*, 467 U.S. at 444 n.5, 104 S.Ct. 2501 ("[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification[.]"). The government may establish routine police procedures by submitting them into evidence, including by "testimony regarding standard practices." *United States v. Mundy*, 621 F.3d 283, 290 n.5 (3d Cir. 2010) (quoting *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)).

*United States v. Bradley*, 959 F.3d 551, 557 (3d Cir. 2020).

At the suppression hearing, the Government established the following facts through the credible testimony of Trooper Beatty:

- there was a valid, pre-existing warrant to arrest the driver, Robertson, directing law enforcement to take him into custody until the warrant cleared;

- the rental agreement had expired one week prior to the traffic stop;

- neither Moore nor Ferguson were listed as authorized drivers on the rental agreement;

- because the rental agreement had expired and the remaining occupants were not authorized to drive it, the vehicle was required to be towed rather than left on the side of the busy onramp to the Highland Park Bridge; and,

- prior to being towed, an inventory search of the vehicle had to be conducted and Pennsylvania State Police procedures required a search of unlocked bags, including the black bag located in the trunk

23

of the vehicle.

To conclude, the challenged evidence within the black bag located by Trooper Beatty in the trunk would have been inevitably discovered by a law enforcement officer following routine police procedures. *See Bradley*, 959 F.3d at 558. Finally, the attenuation doctrine separately precludes Robertson's motion to suppress any evidence seized as to him due to the valid, preexisting and untainted warrant for his arrest arising from a wholly separate incident. *See United States v. Burrus*, 402 F. Supp. 3d 116, 126–27 (W.D. Pa. 2019) (quoting *Utah v. Strieff*, –––U.S. ––––, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016) ("Under the attenuation doctrine, '[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'") (further citations omitted).

V.    CONCLUSION

Based on the foregoing, Defendants' motions to suppress [104], [110] are DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated: June 29, 2020

cc/ecf: All counsel of record.